IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| DJO, LLC, | § | |
| | § | |
| Plaintiff, | § | |
| v. | § | Civil Action No. 3:19-cv-00793 |
| | § | |
| Robert Bryan Bedford, Charles Gavin | § | |
| Copeland, Cofour, LLC, and | § | |
| Hawk CG, LLC, | § | |
| | § | |
| Defendants. | § | |

## PLAINTIFF'S FIRST AMENDED COMPLAINT

Plaintiff DJO, LLC ("DJO"), by its attorneys, submits the following Complaint against Defendants Robert Bryan Bedford ("Bedford"), Charles Gavin Copeland ("Copeland"), Cofour, LLC ("Cofour"), and Hawk CG, LLC ("Hawk") (collectively, "Defendants"), and hereby states and alleges the following:

## INTRODUCTION

1.     This suit arises from Bedford's brazen breach of his contractual, fiduciary, and statutory duties to DJO.  Specifically, starting in 2017 and continuing through the present, Bedford, along with Copeland Cofour, and Hawk, have engaged in a series of actions competitive to DJO's business.  Bedford has violated the non-solicitation provisions in his agreement with DJO, while Bedford and Copeland have engaged in concerted action to steal confidential and proprietary DJO data and misappropriate DJO trade secrets for the benefit of competing businesses.

2.     Despite multiple warnings and demands, Bedford has proven himself unwilling to comply with his ongoing confidentiality obligations and the modest twelve-month post-employment non-solicitation restriction under his agreement with DJO. Instead, Bedford has engaged in a continuous pattern—unknown to DJO until very recently—of concerted action with

1

his long-time friend and now-business partner, Copeland, to harm DJO's competitive interests through the theft of highly sensitive data that belongs to DJO. DJO brings this action to enforce its rights under its agreement with Bedford, to redress the misappropriation of DJO's trade secrets, and to prevent any further irreparable harm to DJO's business.

## THE PARTIES

3.      Bedford is an individual residing in Dallas, Texas and a citizen of Texas. Bedford is a former employee of DJO.  Upon information and belief, Bedford is a principal of Cofour.

4.      Copeland is an individual residing in Frisco, Texas and a citizen of Texas. Copeland is the registered agent and upon information and belief, a principal of Cofour and Hawk.

5.      Cofour is a Texas limited liability company with a principal place of business in Frisco, Texas.

6.      Hawk is a Texas limited liability company with a principal place of business in Frisco, Texas.

7.      DJO, LLC is Delaware limited liability company with a principal place of business in Dallas, Texas. DJO is a leading manufacturer and distributor of medical products.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, predicated upon the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836, *et seq*.  In addition, supplemental jurisdiction over the related state law claims is conferred upon this Court by 28 U.S.C. § 1367(a).

9.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because Bedford resides in this judicial district and the remaining Defendants are both residents of Texas,

a substantial part of the events or omissions giving rise to DJO's claims occurred in this judicial district, and Bedford is subject to personal jurisdiction in this judicial district.

## FACTUAL BACKGROUND

**A.      DJO's Acquisition of Aircast, LLC and Its Contract With Bedford.**

10.      On or about May 23, 2005, Bedford began employment as a sales representative at Aircast, LLC ("Aircast").  When Bedford joined Aircast in 2005, he agreed to the company's Non-Compete and Confidentiality Agreement ("Employment Agreement") in exchange for valuable consideration. A true and correct copy of the Employment Agreement is attached as Exhibit 1.

11.      Aircast was a leading designer and manufacturer of orthopedic devices, including ankle bracing products and vascular systems.

12.      Aircast was acquired by dj Orthopedics, LLC in 2006.  Through this acquisition, dj Orthopedics, LLC acquired all of the contractual rights of Aircast, including its rights under the Employment Agreement.

13.      In May 2006, dj Orthopedics, LLC changed its name to DJO, LLC. Thus, DJO is the owner of all contractual rights in the Employment Agreement between Aircast and Bedford.

**B.      Bedford's Contractual Obligations to Aircast and DJO.**

14.      From the time of the Aircast acquisition in 2006 until May 23, 2018, Bedford was employed by DJO.

15.      In April 2012, Bedford was promoted by DJO to the role of Regional Director, Sales – Bracing and Supports. In that capacity, Bedford was entrusted with responsibility for the sales function of DJO's bracing and supports division in Texas.

16.      While he was employed at DJO, Bedford was a party to the Employment Agreement, which, among other things, required Bedford to "devote full time and best efforts to

the business of the Company" and to "not engage in any business activity which competes with the products or services being developed, marketed or sold by the Company." Exhibit 1, ¶1.

17.     The Employment Agreement also required that, for a period of one year after the end of his employment at DJO, Bedford "will not solicit business from firms that are current clients or active prospects of the Company at the time of such termination . . . on behalf of any entity for products or services similar to those being developed, licensed, or marketed by the Company." Exhibit 1, ¶2.

18.     The Employment Agreement also precluded Bedford from disclosing or using for non-DJO purposes, at any time during or after his employment, any "Confidential Information." Confidential Information is defined to include:

> any information or material of the Company, its licensers, or its clients, written electronic or oral, in whatever form, which the Company possesses that (i) has commercial value, (ii) the unauthorized disclosure of which could cause loss or harm to the Company, or (iii) which the Company is bound not to disclose under the terms of a confidentiality agreement. The Confidential Information includes but is not limited to the customers, prospects, systems, business plans, pricing strategies, financial information (including audited and unaudited statements and projections), products, product concepts, marketing strategies, manufacturing and information techniques, systems and processes, intellectual property and other trade secrets of the Company, its licensers, or its clients as may exist from time to time.

Exhibit 1, ¶3.

19.     The Employment Agreement also required that, upon termination of employment, Bedford would "immediately deliver" to Aircast/DJO all "material relating to any matter within the scope of [Aircast/DJO's] business" and "all copies in [Bedford's] possession or control." Exhibit 1, ¶4.

20.     Bedford's obligations under the Employment Agreement expressly survive termination of employment.  Exhibit 1, ¶8.

**C.**      **While Still Employed by DJO, Bedford Misappropriated DJO's Confidential and Proprietary Information and Shared It With Copeland, Cofour, and Hawk.**

21.      Copeland and Bedford have a long-standing personal friendship that, upon information and belief, extends back to high school.

22.      In September 2016, Copeland formed a new entity called Cofour, LLC.

23.      In March 2018, Copeland formed a new entity called Hawk CG, LLC.

24.      Shortly after Cofour, LLC was formed, Bedford began using his position as a Regional Sales Director for DJO to access DJO's confidential and proprietary information and share it with Copeland.  He did so in anticipation of joining Copeland at Cofour and Hawk and establishing a business competitive with DJO.

25.      Bedford also shared DJO's confidential and proprietary information with Hawk.

26.      Until very recently, DJO was unaware that Bedford had been sharing DJO's confidential and proprietary information with Copeland, Cofour, and Hawk.

**i.**      **Bedford and Copeland Misappropriated Highly Confidential and Proprietary DJO Sales Data In An Effort to Form a Competing Business.**

27.      As a Regional Sales Director, Bedford was in a position of trust at DJO, which included access within the security protocols identified in Paragraph 42 to highly confidential, proprietary, and trade secret information of DJO. Beginning no later than February 2017, Bedford began misusing his position of trust to access DJO's internal data systems and share confidential and proprietary information with Copeland so that Bedford, Copeland, Cofour, and Hawk could develop a business competitive with DJO.

28.      The amount of data misappropriated by Bedford and shared with Copeland, Cofour, and Hawk was massive.

5

29.     For example, in February 2017, Bedford downloaded internal DJO reports containing over 70,000 rows of data about DJO's sales, sales representatives, sales quantities, and the insurance carriers who had paid claims on DJO products. This information is highly valuable to DJO and not shared outside DJO or with its competitors. He then instructed Copeland to filter those reports to identify worker's compensation claims managers with whom Copeland, Cofour, and Hawk could partner to obtain referral business. Copeland then used his wrongful access to DJO's internal data to identify prospective business opportunities and set up meetings to obtain referral business for the benefit of himself, Cofour, and Hawk.

> **ii.     Bedford and Copeland Misappropriated Highly Confidential and Proprietary Data from DJO to Develop a "Medical Device Division" Within a Third-Party Entity.**

30.     In May 2017, Bedford and Copeland developed a plan to launch a "medical device division" within a company (referred to as "BSS") that provides technology solutions and services to sports leagues and clubs. Bedford's and Copeland's plan was to partner with BSS to sell bracing and support products for the prevention of injury. This activity was directly competitive with DJO's bracing and supports business.

31.     In working to launch a medical device division within BSS, Bedford provided Copeland with confidential and proprietary data about DJO products, including pricing data, cost data, and gross profit margin data for hundreds of DJO products.

32.     After using DJO's confidential and proprietary data to plan their competitive venture for several months, and approximately three weeks before Bedford's departure from DJO, Bedford's and Copeland's e-mails indicate that they had "everything in place to move forward" with their plans. Their communications indicate that they had presented another medical device distributor with the opportunity to supply them $1 million to $2 million in products to source their new business.

### iii. Bedford and Copeland Misappropriated Highly Confidential and Proprietary Data Regarding DJO's Distributor Relationship in Texas.

33.     DJO maintains a number of distributor relationships with third-parties that sell DJO products. The terms of those relationships are highly confidential to DJO.

34.     Notwithstanding the highly sensitive nature of the terms of DJO's distributor relationships, in February 2018, Bedford used his access to internal DJO systems to share with Copeland a Distributor Agreement between DJO and one of its distributors in Texas. This agreement contained confidential information about DJO's and the distributor's relationship, including but not limited to information about commission rates, sales territories, and sales goals.

### iv. Bedford Violated His Contractual and Fiduciary Duties By Making Competitive Solicitations, Both Before and After His Departure From DJO.

35.     In April 2018, approximately one month before resigning from his role at DJO, Bedford and Copeland approached a DJO customer (referred to as "VM") in Texas and solicited VM to allow Bedford and Copeland to provide medical billing services for deep vein thrombosis ("DVT") products that compete with the Aircast line of products in DJO's DVT business.

36.     In June 2018, shortly after Bedford's departure from DJO, Bedford held a meeting with VM to solicit the customer to partner with Bedford, Copeland, and Cofour to provide medical billing services for, among other things, DVT products that were directly competitive with DJO's DVT business.

37.     In July 2018, Bedford sent a proposal to VM for Cofour to provide medical billing services to the customer, which were directly competitive with DJO's DVT business.

38.     At all relevant times, VM was a DJO customer for whom Bedford had sales responsibility while he was employed at DJO.

39.     In late 2018, Bedford, through Cofour, began selling DVT products and services directly to at least two additional Dallas-area surgery centers. Both of these surgery centers were customers of DJO for which Bedford had sales responsibility while he worked at DJO.

**D.     The Data Misappropriated by Defendants Were Trade Secrets of DJO.**

40.     DJO has developed a superior knowledge of its business and has enjoyed remarkable success for many reasons, including creating, compiling, and otherwise possessing proprietary and confidential information.

41.     DJO effectively uses its Confidential Information to obtain an advantage over competitors that do not know or do not have access to this information. DJO has invested, and will continue to invest, extensive time, effort, and expense in the development and maintenance of its Confidential Information.

42.     Given the value that DJO ascribes to its Confidential Information, DJO uses reasonable security protocols to secure and maintain the confidentiality of its Confidential Information. These security protocols include: (a) limiting employee access to highly confidential information and trade secrets; (b) ensuring that employees like Bedford who will have access to highly confidential information and trade secrets have a contractual obligation to maintain their secrecy; (c) imposing security restrictions on those who access highly confidential information and trade secrets; and (d) implementing company-wide policies for the protection of confidential and proprietary information.

43.     Much of the confidential and proprietary information that Bedford wrongfully acquired through his position of trust at DJO and misappropriated for the benefit of himself, Copeland, Cofour, and Hawk constitute DJO trade secrets, including but not limited to: (a) DJO's internal data about product pricing; (b) DJO's internal data about product cost; (c) DJO's internal

data about profit margins; (d) DJO's internal data about its relationships with customers and insurance companies; (e) DJO's sales strategies with particular customer accounts; and (f) DJO's internal knowledge about its customers, such as customer preferences and customer lists.

**E.    Upon Being Warned Against Violating His Obligations to DJO, Bedford Falsely Assured DJO That He Was Not Engaging in Conduct Prohibited By the Employment Agreement.**

44.    On August 8, 2018, DJO's Vice President of Human Resources sent Bedford a letter providing Bedford with a copy of the Employment Agreement and reminding Bedford of the key obligations under that agreement, including his obligations of confidentiality, and the prohibition against soliciting DJO's current clients and prospects for products and services similar to those marketed by DJO.

45.    On August 16, 2018, Bedford responded to the letter, falsely assuring DJO that he "ha[d] not violated, and intend[ed] to abide by, any enforceable obligations of the" Employment Agreement.

46.    On January 16, 2019, DJO again wrote to Bedford to remind him of his contractual obligations and to notify him that DJO was aware that Bedford had been soliciting DJO's customers and prospects in violation of the Employment Agreement.

47.    In response to DJO's demand that Bedford stop breaching his agreement, Bedford did not deny that he had engaged in competitive conduct, but instead requested that DJO tell him what he was doing to violate the agreement. When DJO identified specific customers that Bedford had been wrongfully soliciting, Bedford did not deny that he had done so.

48.    Thereafter, DJO continued its investigation and uncovered evidence dating back to 2017, which showed that, in addition to wrongfully competing with DJO, Bedford and Copeland

had misappropriated DJO's highly confidential and proprietary information and trade secrets for the benefit of Cofour and Hawk.

49.     Bedford continues to sell products and services to DJO customers and prospects that are competitive with, and similar to, the Aircast line of products he sold while working at DJO. The full extent of his competitive activity is unknown because Bedford has refused DJO's request that he provide a complete list of the medical products and services he has sold since his departure from DJO, and the entities to whom he has sold them.

50.     Defendants continue to use DJO's Confidential Information and trade secrets to compete with DJO.

**F.     Defendants Conduct Has and Will Continue to Cause Irreparable Harm if Defendants Are Not Enjoined.**

51.     By engaging in the conduct described above, Bedford has enabled competitors, including Defendants, to obtain a competitive advantage it took DJO many years and extensive financial resources to develop and maintain. DJO is now forced to compete with direct competitors that are in possession of DJO's Confidential Information, and upon information and belief, are using that information to enrich themselves at DJO's expense.

52.     Defendants' conduct, as described above, in misappropriating DJO's Confidential Information and trade secrets and wrongfully competing in violation of Bedford's Employment Agreement, has caused irreparable harm to DJO. DJO will suffer further irreparable harm if Defendants' conduct is allowed to continue.

<u>**CAUSES OF ACTION**</u>

<u>**COUNT I – BREACH OF CONTRACT (against Bedford)**</u>

53.     DJO incorporates by reference the allegations in paragraphs 1 through 52 of this Complaint.

54.     In May 2005, Aircast and Bedford entered into the Employment Agreement.  In consideration for entering into the Employment Agreement, Bedford received compensation from Aircast, and later DJO, and received confidential and proprietary information about Aircast's and DJO's business.

55.     DJO acquired the rights of the Employment Agreement through its acquisition of Aircast. The Employment Agreement provided Aircast with the "unrestricted right to assign" the agreement to DJO.

56.     The Employment Agreement is valid and enforceable. Alternatively, to the extent any of the terms of the Employment Agreement are unenforceable, DJO requests that the provisions be reformed to the extent necessary to cause the limitations in the agreement to be reasonable and impose a restraint that is enforceable, pursuant to Texas Business and Commerce Code § 15.51(c).

57.     Bedford breached his obligations under the Employment Agreement by:

a.   Failing to devote his full time and best efforts to DJO during the course of his employment;

b.   Engaging in business activity that was competitive with DJO's products and services during the course of his employment, including activity competitive with DJO's DVT business acquired from Aircast;

c.   Soliciting current customers of DJO and prospects of DJO that were active at the time of Bedford's termination with products and services similar to those marketed by DJO, including solicitations competitive with DJO's DVT business acquired from Aircast;

d.   Using and disclosing DJO's and Aircast's Confidential Information for the benefit of competitors, both during and after his employment at DJO; and

e.   Engaging in other wrongful conduct that may be revealed through discovery.

58.     DJO has been damaged from Bedford's conduct through the loss of customers and business opportunities that it would have received had Bedford complied with his contractual

obligations. The damage DJO has incurred, and will incur in the future if Bedford's wrongful conduct is allowed to continue, is irreparable.

FOR THESE REASONS, and all reasons of record, DJO respectfully requests that the Court enter judgment in its favor and against Bedford, grant DJO a temporary restraining order, preliminary injunctive relief, and permanent injunctive relief against Bedford's violation of his contractual obligations to DJO, and award DJO damages for all losses incurred by DJO, all benefits wrongfully obtained by Bedford, plus attorneys' fees, pre-judgment interest, and costs.

## COUNT II – BREACH OF FIDUCIARY DUTY (against Bedford)

59.    DJO incorporates by reference the allegations in paragraphs 1 through 52 of this Complaint.

60.    As an employee of DJO, Bedford owed DJO a fiduciary duty of loyalty, which included a duty to act in the best interests of DJO and to refrain from engaging in activity competitive with DJO during the course of his employment.

61.    Bedford breached his fiduciary duty of loyalty to DJO by engaging in business activity competitive with DJO during the course of his employment at DJO and by misappropriating DJO's Confidential Information. Bedford's competitive activity included the solicitation of DJO customers and prospects for the benefit of Bedford, Cofour, and Hawk while Bedford was employed by DJO.

62.    DJO suffered damage as a result of Bedford's breach of fiduciary duty in the form of the loss of customers and business opportunities that it would have received had Bedford complied with his fiduciary duty to DJO.

63.    Bedford wrongfully obtained customers, revenue, and business opportunities by his wrongful conduct in breach of his fiduciary duties to DJO.  Bedford should be disgorged of his

wrongful gains and forfeit any compensation received from DJO during the course of his breach of fiduciary duty.

64.     Bedford engaged in fraudulent conduct by falsely assuring DJO that he had not engaged in any conduct that violated his obligations to DJO and by concealing his competitive activities from DJO during the course of his employment.

FOR THESE REASONS, and all reasons of record, DJO respectfully requests that the Court enter judgment in its favor and against Bedford, and award DJO damages for all losses incurred as a result of Bedford's breach of fiduciary duty, disgorge Bedford of all wrongfully obtained gains, order Bedford to forfeit all compensation received from DJO while he was breaching his fiduciary duty, and award DJO prejudgment interest and exemplary damages.

## COUNT III – MISAPPROPRIATION OF TRADE SECRETS IN VIOLATION OF THE FEDERAL DEFEND TRADE SECRETS ACT (18 U.S.C. § 1836, *et seq*) (against all Defendants)

65.     DJO incorporates by reference the allegations in paragraphs 1 through 52 of this Complaint.

66.     DJO has developed, and owns, certain trade secret information (the Confidential Information), including but not limited to: (a) DJO's internal data about product pricing; (b) DJO's internal data about product cost; (c) DJO's internal data about profit margins; (d) DJO's internal data about its relationships with customers and insurance companies; (e) DJO's sales strategies with particular customer accounts; (f) DJO's internal knowledge about its customers, such as customer preferences and customer lists; and (g) other confidential business information that derives independent value from not being known to or readily accessible by the public using proper means.  These trade secrets are related to a product or service used, or intended for use in, interstate or foreign commerce. This information constitutes "trade secrets" under the DTSA.

67.     DJO has undertaken reasonable efforts to maintain the secrecy of its trade secrets and to prevent the unauthorized disclosure or use of its trade secret information.

68.     Bedford acquired knowledge of DJO's trade secrets under circumstances giving rise to a duty to maintain the information as trade secrets.

69.     Acting for his personal gain, Bedford willfully and maliciously misappropriated DJO's trade secrets by using them without DJO's express or implied consent, and disclosing them to Copeland, Cofour, and Hawk for the purpose of competing with DJO. Bedford used improper means to acquire knowledge of the trade secrets by abusing a confidential relationship and by materially breaching his contractual duty to maintain confidentiality of DJO's trade secrets.

70.     At the time of the aforementioned disclosure and use of DJO's trade secrets, Bedford knew or had reason to know that the knowledge of the trade secrets was acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret.

71.     At the time of the aforementioned acquisition of DJO's trade secrets, Copeland, Cofour, and Hawk knew or had reason to know that the trade secrets were acquired by improper means. At the time of the disclosure and use of DJO's trade secrets, Copeland, Cofour, and Hawk knew or had reason to know that the knowledge of the trade secret was acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret. Unless enjoined, Defendants' intentional misuse and Bedford's deception demonstrates that Defendants will continue to use and disclose DJO's trade secrets, and the continued misappropriation of trade secrets will cause irreparable injury to DJO. DJO has no adequate remedy at law to ameliorate the harm caused by the existing and continued

misappropriation of DJO's trade secrets.  Accordingly, DJO seeks preliminary and permanent injunctive relief under the DTSA.

72.     As a direct, proximate, and foreseeable result of Defendants' misappropriation of trade secrets, actual or threatened, DJO has been damaged in an amount not yet fully ascertained, but in any event DJO has already suffered in lost revenue, and corresponding profits, as a proximate result of the misappropriation, and a loss of goodwill with customers.

73.     Defendants' misappropriation of DJO's trade secrets was willful, malicious, and made with the deliberate intent to injure DJO's business, thereby entitling DJO to exemplary damages and/or attorneys' fees in an amount to be proven at trial.

FOR THESE REASONS, and all reasons of record, DJO respectfully requests that the Court enter judgment in its favor and against Defendants, grant DJO a temporary restraining order, preliminary injunctive relief, and permanent injunctive relief against Defendants' misappropriation of DJO's trade secrets, and award DJO damages for all losses incurred by DJO, all benefits wrongfully obtained by Defendants, plus exemplary damages, attorneys' fees, pre-judgment interest, and costs.

### COUNT IV – MISAPPROPRIATION OF TRADE SECRETS IN VIOLATION OF THE TEXAS UNIFORM TRADE SECRETS ACT (CIV. PRAC. & REM. § 134.A.001, *et seq.*) (against all Defendants)

74.     DJO incorporates by reference the allegations in paragraphs 1 through 52 of this Complaint.

75.     DJO has developed, and owns, certain trade secret information (the Confidential Information), in the form of customers, prospects, systems, business plans, pricing strategies, financial information, products, product concepts, marketing strategies, manufacturing and information techniques, systems and processes, and other confidential business information.

76.     The information derives independent economic value from not being generally known to, and not being readily ascertainable by proper means by, other persons who could obtain economic value from its disclosure or use, and said information was subject to efforts that were reasonable under the circumstances to maintain the secrecy of the information. As such, this information constitutes "trade secrets" under Texas's Uniform Trade Secrets Act, Tex. CIV. PRAC. & REM. § 134.A.001, *et seq*.

77.     Defendants, through improper means, misappropriated DJO's trade secrets for the express purpose of personally enriching themselves and for the purpose of providing themselves with stolen trade secrets with which Defendants have unlawfully and directly competed with DJO.

78.     Bedford used improper means to acquire knowledge of the trade secrets by abusing a confidential relationship and by materially breaching his contractual duty to maintain confidentiality of DJO's trade secrets.

79.     At the time of the aforementioned disclosure and use of DJO's trade secrets, Defendants knew or had reason to know that the knowledge of the trade secrets was acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret.

80.     At the time of the aforementioned acquisition of DJO's trade secrets, Defendants knew or had reason to know that the trade secrets were acquired by improper means.  At the time of the disclosure and use of DJO's trade secrets, Defendants knew or had reason to know that the knowledge of the trade secret was acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret

81.     Defendants' misappropriation of DJO's trade secrets was willful and malicious, has caused irreparable harm to DJO, and such harm cannot be adequately compensated for in damages alone.

82.     Under TEX. CIV. PRAC. & REM. § 134.A.001, *et seq*., DJO hereby sues to recover actual damages, court costs, attorneys' fees, exemplary damages, and a preliminary and permanent injunction.

FOR THESE REASONS, and all reasons of record, DJO respectfully requests that the Court enter judgment in its favor and against Defendants, grant DJO a temporary restraining order, preliminary injunctive relief, and permanent injunctive relief against Defendants' misappropriation of DJO's trade secrets, and award DJO damages for all losses incurred by DJO, all benefits wrongfully obtained by Defendants, exemplary damages, plus attorneys' fees, pre-judgment interest, and costs.

## COUNT V – CIVIL CONSPIRACY (against Bedford and Copeland)

83.     DJO incorporates by reference the allegations in paragraphs 1 through 52 of this Complaint.

84.     Bedford and Copeland acted in combination to achieve a common goal and joined together in a conspiracy to, among other things, have Bedford breach his contractual obligations and fiduciary duties to DJO and misappropriate DJO's Confidential Information to unfairly compete with DJO.

85.     Bedford and Copeland were members of the conspiracy, the object of which was to accomplish an unlawful purpose or a lawful purpose by unlawful means, such as directing Bedford's breach of contractual obligations to DJO and misappropriating DJO's Confidential Information to compete with DJO and/or to otherwise unlawfully benefit.

86.     Bedford and Copeland had a meeting of the minds on the object or course of action.

87.     Bedford and/or Copeland committed an unlawful, overt act to further the object or course of action.

88.     DJO suffered injury as a proximate result of the wrongful act.

FOR THESE REASONS, and all reasons of record, DJO respectfully requests that the Court enter judgment in its favor and against Bedford and Copeland, grant DJO a temporary restraining order, preliminary injunctive relief, and permanent injunctive relief against Defendants' misappropriation of DJO's trade secrets, and award DJO damages for all losses incurred by DJO, all benefits wrongfully obtained by Bedford and Copeland, plus attorneys' fees, pre-judgment interest, and costs.

## COUNT VI – TORTIOUS INTERFERENCE WITH EMPLOYMENT CONTRACT
### (against Copeland)

89.     DJO incorporates by reference the allegations in paragraphs 1 through 52 of this Complaint.

90.     In May 2005, Aircast and Bedford entered into the Employment Agreement.  In consideration for entering into the Employment Agreement, Bedford received compensation from Aircast, and later DJO, and received confidential and proprietary information about Aircast's and DJO's businesses.

91.     DJO acquired the rights of the Employment Agreement through its acquisition of Aircast.  The Employment Agreement provided Aircast with the "unrestricted right to assign" the agreement to DJO.

92.     The Employment Agreement is valid and enforceable.

93.     Upon information and belief, Copeland was aware of Bedford's Employment Agreement. At a minimum, during the timeframe complained of, Copeland was aware that Bedford

18

was employed by DJO and therefore had obligations, including, among other things, duties of confidentiality, to DJO.

94.     Among other things, the Employment Agreement:

a.   required Bedford to devote his full time and best efforts to DJO during the course of his employment;

b.   prohibited Bedford from engaging in business activity that was competitive with DJO's products and services during the course of his employment;

c.   prohibited Bedford from soliciting customers and prospective customers of DJO with products and services similar to those marketed by DJO; and

d.   prohibited Bedford from using and disclosing DJO's and Aircast's confidential information for the benefit of competitors, both during and after his employment at DJO.

95.     Copeland willfully and intentionally interfered with the Employment Agreement, including at least with the four obligations in Paragraph 94, by, among other things:

a.   Encouraging, inducing, requesting, partnering, and/or working with Bedford to establish competitive business opportunities to DJO, while Bedford was employed by DJO;

b.   Encouraging, inducing, requesting, partnering, and/or working with Bedford to solicit customers and prospective customers of DJO with products and services similar to those marketed by DJO, both during and after Bedford's employment with DJO; and

c.   Encouraging, inducing, requesting, partnering, and/or working with Bedford to obtain, disclose, and use DJO's and Aircast's trade secrets and/or other confidential and proprietary information for the benefit of competitors, both during and after Bedford's employment with DJO.

96.     Copeland wanted to compete with DJO and therefore, caused or wished to cause, Bedford to breach the Employment Agreement and provide Copeland with DJO's trade secrets and other confidential, proprietary information to, among other things, solicit DJO's customers and prospective customers.

97.     DJO has been damaged as a proximate result of Copeland's conduct through the loss of customers and business opportunities that it would have received had Copeland not interfered with Bedford's contractual obligations.

FOR THESE REASONS, and all reasons of record, DJO respectfully requests that the Court enter judgment in its favor and against Copeland and award DJO damages for all losses incurred by DJO, all benefits wrongfully obtained by Copeland, plus attorneys' fees, pre-judgment interest, and costs.

## COUNT VII –KNOWING PARTICIPATION IN BREACH OF FIDUCIARY DUTY
### (against Copeland)

98.     DJO incorporates by reference the allegations in paragraphs 1 through 52 of this Complaint.

99.     As an employee of DJO, Bedford owed DJO a fiduciary duty of loyalty, which included a duty to act in the best interests of DJO and to refrain from engaging in activity competitive with DJO during the course of his employment.

100.    Copeland ware aware Bedford was an employee of DJO and that Bedford owed DJO a fiduciary duty of loyalty.

101.    Bedford breached his fiduciary duty of loyalty to DJO by engaging in business activity competitive with DJO during the course of his employment at DJO and by misappropriating DJO's Confidential Information. Bedford's competitive activity included the solicitation of DJO customers and prospects for the benefit of Bedford, Copeland, Cofour, and Hawk, while Bedford was employed by DJO.

102.    Copeland knowingly participated in Bedford's breach of his fiduciary duty of loyalty to DJO by, among other things, encouraging, inducing, requesting, partnering, and/or working with Bedford to: establish competitive business opportunities to DJO; solicit customers

and prospective customers of DJO with products and services similar to those marketed by DJO; and obtain, disclose, and use DJO's trade secrets and other confidential and proprietary information for the benefit of competitors.

103.    DJO suffered damage as a result of Bedford's breach of fiduciary duty and Copeland's knowing participation in that breach of duty in the form of the loss of customers and business opportunities that it would have received had Bedford complied with his fiduciary duty to DJO.

FOR THESE REASONS, and all reasons of record, DJO respectfully requests that the Court enter judgment in its favor and against Copeland, and award DJO damages for all losses incurred as a result of Copeland's participation in Bedford's breach of fiduciary duty, disgorge Copeland of all wrongfully obtained gains, and award DJO prejudgment interest and exemplary damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff DJO, LLC respectfully requests that the Court:

A.    Enter judgment that Bedford has breached the Employment Agreement;

B.    Enter judgment that Bedford has breached his fiduciary duty to DJO;

C.    Enter judgment that Defendants have misappropriated DJO's trade secrets pursuant to the federal Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.*;

D.    Enter judgment that Defendants have misappropriated DJO's trade secrets pursuant to the Texas Uniform Trade Secrets Act Tex. Civ. Prac. & Rem. § 134.A.001, *et seq.*;

E.    Enter judgment that Defendants have engaged in civil conspiracy;

F.    Enter judgment that Copeland engaged in tortious interference with the Employment Agreement;

G.      Enter judgment that Copeland knowingly participated in Bedford's breach of fiduciary duty to DJO;

H.      Award DJO actual damages caused by Defendants;

I.      Award DJO exemplary damages and any additional damages available under law;

J.      Award DJO the costs of this suit, including reasonable attorneys' fees as provided by law;

K.      Award DJO pre-judgment and post-judgment interest;

L.      Enjoin Defendants from any further use or disclosure of DJO's trade secrets and/or confidential and proprietary information, including from competing with DJO by soliciting DJO's customers or prospective customers.

M.      Order Defendants to return all DJO trade secrets and/or other confidential and proprietary information in their possession, custody, or control and identify: (i) all entities and individuals that Defendants or any one Defendant disclosed, shared, or otherwise disseminated DJO's trade secrets and/or other confidential information to, including identifying the information disclosed; and (ii) all entities and individuals that Defendants or any one Defendant solicited for business to compete with DJO; and

N.      Grant any such other and further relief to which DJO may be entitled or is necessary to remedy the damages caused by the unlawful conduct of Defendants and as the Court deems just and/or equitable.

## **JURY DEMAND**

Plaintiff requests a jury trial on all claims triable by jury.

DATED: August _, 2019          Respectfully submitted,

NIXON PEABODY, LLP

By: */s/ Richard H. Tilghman IV*

      **Michael J. Philippi (*pro hac vice* )**
      mphilippi@nixonpeabody.com
      **Lisa C. Sullivan (*pro hac vice* )**
      lcsullivan@nixonpeabody.com
      **Richard H. Tilghman (*pro hac vice*)**
      rhtilghman@nixonpeabody.com
      NIXON PEABODY, LLP
      70 W. Madison St., Suite 3500
      Chicago, IL 60602
      Telephone: 312-977-4881
      Facsimile: 312-977-4405

      **Troy K. Lieberman (*pro hac vice*)**
      tlieberman@nixonpeabody.com
      NIXON PEABODY LLP
      Exchange Place
      53 State Street
      Boston, MA 02109
      Telephone: 671-345-1000
      Facsimile: 617-345-1300

      **Laura De Santos**
      State Bar No. 00793612
      ldesantos@grsm.com
      **Christopher M. Raney**
      State Bar No. 24051228
      craney@grsm.com
      1900 West Loop South, Suite 1000
      Houston, TX 77027
      (713) 961-3366 (Telephone)
      (713) 961-3938 (Facsimile)

          -and-

      **Soña Garcia**
      State Bar No. 24045917
      sjgarcia@grsm.com
      2200 Ross Avenue, Suite 4100W
      Dallas, Texas 75201
      (214) 231-4660 (Telephone)
      (214) 461-4053 (Facsimile)

**ATTORNEYS FOR DJO, LLC**

EXHIBIT 1



## Non-Compete and Confidentiality Agreement

### Direct Sales Representatives

This Non-Compete and Confidentiality Agreement is made as of the Employee Start Date indicated below, by and between Aircast LLC, a New Jersey corporation (the "Company"), and the undersigned Employee. In consideration of the employment of Employee by the Company, the Employee agrees as follows:

1.      During the period of employment by the Company, the Employee will devote full time and best efforts to the business of the Company and will not engage in any business activity which competes with the products or services being developed, marketed or sold by the Company.

2.      For a period of one year after termination of the Employee's employment with the Company for any reason, the Employee will not solicit business from firms that are current clients or active prospects of the Company at the time of such termination (a) for any purpose on behalf of the Specifically Excluded Competitors on Schedule A (or their successors), or (b) on behalf of any entity for products or services similar to those being developed, licensed, or marketed by the Company. Additionally, during this period, Employee will not recruit employees of the Company or otherwise seek to induce such employees to terminate employment with the Company or violate any agreement with the Company.

3.      At any time during or after employment, Employee will not disclose to anyone outside the Company, and will not use except in the business of the Company, any Confidential Information either during or after employment by the Company, except with the written permission of the Company. "Confidential Information" means any information or material of the Company, its licensers, or its clients, written electronic or oral, in whatever form, which the Company possesses that (i) has commercial value, (ii) the unauthorized disclosure of which could cause loss or harm to the Company, or (iii) which the Company is bound not to disclose under the terms of a confidentiality agreement. This Confidential Information includes but is not limited to the customers, prospects, systems, business plans, pricing strategies, financial information (including audited and unaudited statements and projections), products, product concepts, marketing strategies, manufacturing and information techniques, systems and processes, intellectual property and other trade secrets of the Company, its licensers, or its clients as may exist from time to time.

However Confidential Information shall not include:
a. Information which at the time of disclosure is in the public domain, by publication or otherwise, through no act of Employee.
b. Information which can be demonstrated was in the Employee's lawful possession prior to Aircast's disclosure.
c. Information which is furnished by Aircast to others on a non-confidential basis.

4.      Employee agrees that any material relating to any matter within the scope of the business of the Company, and any materials of licensers or clients of the Company, is and shall remain the property of the Company, and that upon termination of employment or at any earlier time as requested by the Company, the Employee will immediately deliver such material and all copies in

Aircast Sales Confidentiality Agreement 05 03 041.DOC

2

Employee's possession or control to the Company. Any right of retention of Confidential Information in any form is expressly excluded.

5.      Employee hereby assigns to the Company the Employee's entire right, title, and interest in each and every work product related to any business, article, machine, product, process, design, device, material, software or hardware of the actual or anticipated business and products of the Company which are made, used, sold or under development. Such work product will be assigned whether: (a) made, developed or conceived solely by the Employee or jointly with others during or in the course of the Employee's employment by the Company, (b) made, developed or conceived wholly or partially as the result of any task assigned to the Employee or any work performed by the Employee for or on behalf of the Company, and/or (c) made or developed with the use of the Company facilities or equipment.

6.      Employee represents that, to the best of the Employee's knowledge, employment by the Company will not conflict with any agreement to which the Employee is subject.

7.      Employee will not disclose to the Company, and will not induce the Company to use, any Confidential Information or material belonging to others.

8.      Employee's obligations under this Agreement shall survive the termination of employment. The Employee understands that this Agreement does not create an obligation of the Company or any other party to continue employment.

9.      The Company shall have the unrestricted right to assign this Agreement to its parent Company, its affiliates, and any and all successors in interest.

10.     Any breach of this Agreement by the Employee may cause irreparable damage, and in the event of such a breach, the Company shall have, in addition to any remedies at law, the right to an injunction to prevent or restrain a breach of the Employee's obligations hereunder.

11.     This Agreement shall be construed in accordance with the laws of New Jersey.

IN WITNESS WHEREOF, the undersigned parties have executed this Agreement as a sealed instrument as of this _6th_ day of _May_ , 20_05_.

AGREED BY:

Name: _BRIAN Redford_
(the "Employee")

_(Employee Signature)_

Employee Start Date _5/23/05_

ACCEPTED BY:

Aircast LLC
(the "Company")

H. William Devitt III
General Counsel